**In re George Roger EASTON and Elsie M. Easton, Debtors.**

**OTOE COUNTY NATIONAL BANK, Appellant,**

v.

**George Roger EASTON and Elsie M. Easton, Appellees.**

No. 88–2052.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1988.

Decided Aug. 23, 1989.

---

Karen M. McCarthy, Sioux City, Iowa, for appellant.

Wanda Howey–Fox, Yankton, S.D., for appellees.

Before BOWMAN and MAGILL, Circuit Judges, and HANSON, Senior District Judge.[*]

BOWMAN, Circuit Judge.

In this case we must decide whether the courts below erred in conferring statutory "family farmer" status upon appellees pursuant to 11 U.S.C. § 101(17)(A) (Supp. V 1987). Otoe County National Bank (creditor) appeals from a final judgment of the District Court [1] affirming both the Bankruptcy Court's [2] determination that George Roger Easton and Elsie M. Easton (debtors) meet the statutory definition of "fami-

ly farmer" and hence are eligible for relief under Chapter 12 of the Bankruptcy Code (Code), 11 U.S.C. §§ 1201–1231 (Supp. V 1987), and its confirmation of debtors' fifth amended plan of reorganization. Each of the courts below stayed its judgment pending appeal. We vacate the judgment of the District Court, and remand for further proceedings.

Debtors own approximately 520 acres of land in Plymouth County, Iowa. They filed their Chapter 12 petition in the Bankruptcy Court on February 13, 1987. In 1986 debtors leased 60 acres of cultivable land to Rick Easton (their grandson) and 290 acres of cultivable land to Larry Ritz (a neighbor) for $85 per acre; George Easton raised cattle on the remaining 170 acres of pastureland. In 1983 Rick Easton obtained a $370,000 loan from creditor for the purpose of constructing a hog-raising facility on a two-acre parcel he had purchased from debtors, who co-signed the note and pledged 150 acres as security for the loan. Rick Easton's hog-raising enterprise proved unable to generate sufficient income to service the loan, and debtors ultimately elected to seek Chapter 12 protection when pressed by creditor for repayment.

The Bankruptcy Court found that debtors "derived a minimal income from the sale of cattle in 1986," and that "[t]he vast majority of [debtors'] income [in 1986] was derived from the cash rent of their real estate and social security." [3] While the Bankruptcy Court found that "not more than 50 percent of [debtors'] income arose from the rental payments received from Rick [Easton], together with the cattle income," it ruled that "all the rental income [i.e. rent payments debtors received in 1986 from both Rick Easton and Larry Ritz] ... are [sic] considered farm income for purposes of meeting the farm eligibility test,"

---

[*] The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

[1] The Honorable Donald E. O'Brien, Chief United States District Judge for the Northern District of Iowa.

[2] The Honorable Michael J. Melloy, Chief United States Bankruptcy Judge for the Northern District of Iowa.

[3] *In re Easton,* 79 B.R. 836, 837 (Bankr.N.D. Iowa 1987), *aff'd,* 104 B.R. 111 (N.D.Iowa 1988).

Transcript of November 30, 1987 Hearing at 29, and the District Court agreed. Creditor challenges this ruling on appeal.

■ The Code provides that "[o]nly a family farmer with regular annual income may be a debtor under chapter 12." 11 U.S.C. § 109(f) (Supp. V 1987). The Code defines "family farmer," in relevant part, as follows:

> [An] ... individual and spouse *engaged in* a farming operation whose aggregate debts do not exceed $1,500,000 and not less than 80 percent of whose aggregate noncontingent, liquidated debts ... on the date the case is filed, arise out of a farming operation *owned or operated by* ... such individual and spouse, and ... such individual and spouse receive *from such farming operation* more than 50 percent of ... such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning ... such individual and spouse was filed.

11 U.S.C. § 101(17)(A) (Supp. V 1987) (emphasis added). As mentioned, the courts below found that debtors do not meet the income requirement of § 101(17)(A) for the test year (1986) unless the rent they received from Larry Ritz is treated as income legally capable of satisfying that requirement. We hold that in so treating the rent debtors received from Larry Ritz [4] the courts below applied an erroneous standard of law.

Under section 101(17)(A), in order for an individual and spouse to qualify as a "family farmer" they among other things must have received more than fifty percent of their gross income in the relevant year from a particular source, namely, "from such farming operation." From a syntactical point of view, identification of the antecedent of the word "such" in the phrase "from such farming operation" admits of two possibilities: it may refer to the farming operation described in the immediately preceding clause of the statute ("a farming operation owned or operated by" the individual and spouse) or it may refer to the farming operation described in the opening clause of the statute (a farming operation "engaged in" by the individual and spouse). To render our disposition in this case it is not necessary that we choose between these constructions,[5] for the courts below granted debtors "family farmer" status without regard to whether debtors satisfied either of these statutory benchmarks with respect to the crop-production enterprise underway on the 290 acres debtors had leased to Larry Ritz. Rather, the courts below found it appropriate to treat as § 101(17)(A) income the rent debtors received from Larry Ritz in 1986 based on what the courts below refer to as the "totality of the circumstances" test articulated in Judge Cudahy's separate opinion in *In re Armstrong*, 812 F.2d 1024, 1030–31 (7th Cir.) (opinion concurring in part and dissenting in part), *cert. denied*, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 248 (1987).[6]

In *Armstrong*, a divided panel of the Court of Appeals for the Seventh Circuit held that, in the context of an involuntary bankruptcy action filed against a debtor by a creditor under 11 U.S.C. § 303 (1982), cash rent a debtor receives from a tenant

---

**4.** Debtors received rent in 1986 from Larry Ritz, Ed Ritz, and Triple J Farm, the latter an entity through which Larry Ritz conducts business. Appendix at 15, 18, 20, 33; Transcript of May 12, 1987 Hearing at 3. The courts below, and the parties in their briefs and at oral argument, refer to the rent debtors received from each of these sources collectively as rent received from or paid by Larry Ritz. For simplicity's sake we continue this usage here.

**5.** No Circuit Court of Appeals has been called upon to resolve explicitly this particular question. The Court of Appeals for the Eleventh Circuit appears to have parsed § 101(17)(A) in a fashion consistent with the second possible

reading we have outlined in the text, though it does not seem to us that the resolution of the case turned on that particular reading. *See Federal Land Bank v. McNeal (In re McNeal)*, 848 F.2d 170 (11th Cir.1988).

**6.** *See In re Easton*, 79 B.R. at 838 ("This Court believes, however, the better reasoned approach is represented by the minority opinion in the *Armstrong* case."); *Easton*, 104 B.R. at 112 ("[T]he court embraces the 'totality of the circumstances' approach taken by the bankruptcy court ... and wholeheartedly agrees with the bankruptcy court's rejection of the approach taken by the majority in *In re Armstrong....*").

farmer for the lease of land is not income from a farming operation because such a lease does not expose the debtor to the risk of non-payment in the event of some natural calamity to the crops being produced on the leased acreage. *Id.* at 1028–29. Judge Cudahy, on the other hand, would treat cash rent as income received from a farming operation if in the totality of the circumstances it could be shown that "the land rental was an integral part of [debtor's] farming operation." *Id.* at 1031. In the case at bar, the Bankruptcy Court noted that debtors have owned their acreage for forty years and in the past have themselves farmed the land,[7] are "engage[d] in a traditional farming operation, that is, the raising of cattle," and have debts the majority of which it perceived to "arise out of a family farm operation." *In re Easton,* 79 B.R. at 838. Based on the totality of these circumstances, the Bankruptcy Court concluded that the rent debtors received from Larry Ritz is applicable toward satisfaction of § 101(17)(A)'s income requirement. The District Court endorsed this analysis and found it particularly significant that debtors could conceivably lose their farm if they were to insist that Rick Easton pay his rent when he is financially unable to do so and at the same time make payment on his loan to creditor, secured by 150 acres of debtors' land. *Easton,* 104 B.R. at 112.

The *Armstrong* court was called upon to determine the proper characterization of cash rent payments received by a debtor against whom an involuntary bankruptcy case is filed because under 11 U.S.C. § 303(a) an involuntary case cannot be commenced against a "farmer," defined by the Code as a "person that received more than 80 percent of such person's gross income ... from a farming operation owned or operated by such person." 11 U.S.C. § 101(17) (1982) (now codified at 11 U.S.C. § 101(19) (Supp. V 1987)). Whatever the

comparative merits of the "risk" versus the "totality of the circumstances" tests in the *Armstrong* context—and we seriously doubt whether there is any warrant for importing either concept into the construction of the Code's facially unambiguous definition of "farmer"[8]—we do not consider either test appropriate in the determination whether money an individual receives from a given source is income "from such farming operation" within the meaning of § 101(17)(A). As we have said earlier in this opinion, this inquiry requires courts to identify those farming activities engaged in or owned or operated by someone claiming statutory "family farmer" status and then to determine whether that individual received more than fifty percent of his or her gross income in the relevant year from those activities. For example, in our view it is entirely possible that the cash rent Armstrong received from his tenant farmer could properly be characterized as § 101(17)(A) income because there was some evidence suggesting that Armstrong engaged in the cultivation of crops on the leased acreage. *See Armstrong,* 812 F.2d at 1027. The proper characterization of that income turns, however, not upon any risk of non-payment Armstrong might have faced, nor upon the universe of the particular circumstances surrounding Armstrong's financial situation, but rather upon the extent to which the income in question bears the relation to his farming activities prescribed by the words of the statute.

We believe the Bankruptcy Court's analysis admits of no readily discernible limiting principle, and would if followed lead to the evisceration of § 101(17)(A)'s income requirement. For example, so long as an individual tended some livestock or raised some crops, he would be permitted, under the Bankruptcy Court's analysis, to count as § 101(17)(A) income all rents he received from tenant farmers, however

---

7. George Easton testified that he rented out his cultivable land on a dollar-per-acre basis in 1985 and 1986 and that he had this acreage "custom farmed" in 1984. Transcript of May 12, 1987 Hearing at 6.

8. To the extent that Congress considered exposure to "risk" a relevant concept in its definition of "farmer," it articulated as much by prescribing that it is risk attendant to owning or operating a farming operation that serves to distinguish statutory from non-statutory income.

minimal his income from raising livestock or crops (indeed, perhaps without regard to whether he garnered any income from those activities at all, for in this case the Bankruptcy Court found that debtors have basically retired from farming), so long as it could be said that the individual lived on the land and rented out acreage in an effort to generate sufficient income to service farm debt. Indeed, the Bankruptcy Court's rulings in this very case illustrate the indeterminacy of its approach, for it justified first the inclusion as § 101(17)(A) income the rent paid debtors by Rick Easton and, later and more expansively, the rent paid them by Larry Ritz, on the observation that debtors "have been engaged in farming and have lived upon the farm for over 40 years." 79 B.R. at 838.[9]

■ Further, we reject the proposition, apparently relied on by the Bankruptcy Court, that the renting out of land *simpliciter* constitutes "farming," and hence by statutory definition, a "farming operation." *See* 79 B.R. at 838 (citing for this proposition *In re Welch*, 74 B.R. 401 (Bankr.S.D. Ohio 1987), which relied in turn upon a definition of "to farm" found in Black's Law Dictionary). To say that the renting out of land is "farming" does not seem to us to square with the statute since all of its other operative terms describe active production of farm commodities or active working of the land. This suggests to us that "farming" is to be understood in its ordinary usage, and not in the strained sense suggested by *Welch*. If the renting of land constitutes a "farming operation" as defined by § 101(20), then an owner of land, whether or not he raises any crops or tends any livestock, would be able to claim the rent he receives from his tenant farmers as § 101(17)(A) income. We doubt that Congress erected Chapter 12 upon that premise. This construction of § 101(17)(A) would permit those who rent out farmland but who have no connection with the production of crops or livestock to conceivably gain statutory "family farmer" status, a possibility which the proponents of Chapter

12 specifically designed § 101(17)(A)'s income requirement to preclude. *See* 132 Cong.Reg. 9985 (1986) (remarks of Sen. McConnell). In fact, we have recently rejected such a result in the context of a corporate debtor seeking "family farmer" status under § 101(17)(B). *See Tim Wargo & Sons, Inc. v. Equitable Life Assurance Society (In re Tim Wargo & Sons, Inc.)*, 869 F.2d 1128 (8th Cir.1989).

As we noted earlier, the District Court found it significant that debtors' lease arrangement with Rick Easton was, in theory, not risk-free, since receipt of rent from Rick Easton could result in his failing to make payment on his loan from creditor, which might then elect to exercise its rights against debtors' land. Whether this reasoning provides a sufficient basis for counting as § 101(17)(A) income the rent debtors received from Rick Easton—an issue we need not decide since the Bankruptcy Court found that debtors do not meet the more-than-fifty-percent requirement without counting the rent paid by Larry Ritz—surely it is a non sequitur to conclude that the rent debtors received from Larry Ritz is therefore also § 101(17)(A) income. Since Larry Ritz had not obtained a loan from creditor secured by land pledged by debtors or otherwise guaranteed by them in any fashion, their rental arrangement with him could not have carried within itself the same dire potentiality posited by the District Court with respect to their rental arrangement with their grandson.

While the question of the proper interpretation of § 101(17)(A) is one of first impression in this Circuit, the approach we take in this opinion is not without precedent. For example, in *In re Dakota Lay'd Eggs*, 57 B.R. 648 (Bankr.D.N.D.1986), the question was whether debtor was a "farmer" under the Code in the context of a creditor-filed involuntary bankruptcy action; this inquiry required the court to determine whether debtor received various items of income "from a farming operation

---

**9.** Indeed, on this analysis there would seem little reason not to include as § 101(17)(A) income the salary an individual might earn in some other occupation, so long as he continued to do some farming and took on the non-farm employment in an effort to service farm debt.

owned or operated" by it. 11 U.S.C. § 101(17) (1982) (now codified at 11 U.S.C. § 101(19) (Supp. V 1987)). The court stated the relevant inquiry as follows: "[T]he determination must be made ... whether [debtor's] income is derived from its own farming or production efforts as opposed to the farming or production efforts of others." *Id.* at 656. Applying this test separately to each claimed item of income, the court declined to treat as statutory income sums debtor received from the sale of eggs which came from flocks neither owned nor managed by it. In *In re Guinnane,* 73 B.R. 129 (Bankr.D.Mont.1987), a case decided under § 101(17)(A), the court characterized a controverted item of income as farm income because, among other things, it was "not derived from third party efforts, but from the Debtors' efforts." *Id.* at 132. In *In re Haschke,* 77 B.R. 223 (Bankr.D.Neb.1987), the court declined to treat as § 101(17)(A) income cash rent debtors had received because, among other things, the court found "no evidence of the debtors' involvement in the farming of the property." *Id.* at 225. And we read *In re Burke,* 81 B.R. 971 (Bankr.S.D.Iowa 1987), a case cited to us by both parties, to stand for the proposition that rent a debtor receives for use of land under a crop share arrangement is proper § 101(17)(A) income when the debtor plays a significant role in farming the leased acreage.[10] *Cf. In re Martin,* 78 B.R. 593, 597 (Bankr.D.Mont. 1987) (money debtor receives for cutting and marketing hay grown on another's land is § 101(17)(A) income). The theme common to these cases is the existence of some indicia of involvement on the part of the debtor in the farming activity which generates the income he seeks to have credited toward satisfaction of the income requirement of § 101(17)(A).

Debtors place principal reliance on *In re Jessen,* 82 B.R. 490 (S.D.Iowa 1988), and *In re Welch,* 74 B.R. 401 (Bankr.S.D.Ohio 1987), in support of the result reached below. We have explained why we believe the *Welch* court's treatment of cash rent does not square with the statute. *Jessen* is but an application of the *Burke* case and thus is, as we have just discussed, not helpful to debtors' position. Debtors also cite *In re Paul,* 83 B.R. 709 (Bankr.D.N.D. 1988), and *In re Rott,* 73 B.R. 366 (Bank.D. N.D.1987), in support of their eligibility for Chapter 12 relief. Again, we are not persuaded that either is helpful to debtors' case. In *Paul* the evidence "plainly demonstrate[d]" that the debtors' grain production operation generated sufficient income to satisfy § 101(17)(A) in the relevant year. 83 B.R. at 712. In *Rott,* as in *Burke* and *Jessen,* the court credited cash rent received by debtors toward satisfaction of the statutory income requirement because it perceived the rental arrangement to be temporary. 73 B.R. at 373. As we have just noted, whether this consideration is relevant, debtors' renting out of their cultivable acreage here cannot be characterized, on the record before us, as temporary.

Debtors in the present case, as the lower courts recognized, engaged in the raising of livestock in 1986. The raising of livestock is plainly a "farming operation," *see* 11 U.S.C. § 101(20) (Supp. V 1987),[11] and any money they received from that activity qualifies as § 101(17)(A) income. On the present state of the record, however, we cannot determine whether debtors bear any § 101(17)(A) relation to the "farming operation," that is, to the "production or raising of crops" taking place on the 290 acres rented by Larry Ritz. Although the Bankruptcy Court characterized the money debt-

**10.** *Burke* also states: "Income received from a cash rent arrangement will be farm income in the case of an individual or individual and spouse only if the evidence reveals that past farming activities have been more than short term or sporadic and that any cessation of farming activities is temporary." 81 B.R. at 976–77. Whether this language is consonant with our explication of § 101(17)(A) today, it is of no help to debtors. Since the courts below found that debtors have substantially retired from active farming, it cannot be said that their cessation from farming the acreage leased to Larry Ritz is temporary.

**11.** Section 101(20) reads: " '[F]arming operation' includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state."

ors received from Larry Ritz in 1986 as "cash rent"—thereby perhaps by implication permitting us to conclude that debtors had no involvement in the production of crops on that parcel beyond that of a lessor of land—this financial arrangement does not necessarily preclude the possibility that debtors played a statutorily significant role vis-a-vis the production of crops on that acreage. We vacate and remand so that debtors may have the opportunity to demonstrate that the money they received from Larry Ritz is in fact proper § 101(17)(A) income under the legal standard we have set forth in this opinion. Those sums cannot be counted as § 101(17)(A) income unless debtors show that they had some significant degree of engagement in, played some significant operational role in, or had an ownership interest in the crop production which took place on the acreage they rented to Larry Ritz.

■ We find the result reached below troubling in a further respect. The Bankruptcy Court ruled that "[t]he majority of the debts owed by the Debtors arise out of a family farm operation, that is the debts represent the grandfather's guarantee of his grandson's debts for the hog confinement facility and hog raising operation." 79 B.R. at 838. The Bankruptcy Court accordingly counted toward satisfaction of § 101(17)(A)'s eighty percent debt requirement the $370,000 debtors owe creditor because "[t]he debt arose out of a farming operation. It's their land that was pledged as a mortgage." Transcript of November 30, 1987 Hearing at 29.

We believe that in evaluating debtors' $370,000 debt to creditor the Bankruptcy Court applied an erroneous legal standard. Certainly this debt arose out of a farming operation, but the inquiry does not end there. Under § 101(17)(A) at least eighty percent of debtors' liquidated, noncontingent debt must arise out of a farming operation *owned or operated by debtors*. Debtors became liable to creditor in the amount of $370,000 because their grandson's hog-raising enterprise failed. On the present state of the record, it does not appear that this debt arises from a farming operation that the debtors either own or operate.

That debtors had pledged land as security for creditor's loan to Rick Easton does not permit a contrary conclusion. Land or an interest in land, without more, is plainly not a farming operation, *see* § 101(20). The Bankruptcy Court's analysis would permit characterization as debt arising out of a farming operation any loan secured by farmland regardless of the purpose to which the borrowed funds have been put. That approach is not faithful to the language of the statute because it would permit inclusion toward satisfaction of the minimum debt requirement debt incurred by an owner of land without regard to the connection between the debt and the debtor's own farming activity. *See Armstrong*, 812 F.2d at 1030 (debtor's personal guarantee of creditor's loan to seed company is not debt arising out of farming operation); *In re Douglass*, 77 B.R. 714, 715 (Bankr.W.D.Mo.1987) ("[T]he reason or purpose for which the debt was incurred coupled with the use to which the borrowed funds were put ... should be the criteria to determine whether the debt 'arises out of a farming operation'."; debt secured by deed of trust on debtors' service station property is debt arising out of a farming operation where debtors used the borrowed funds to keep their farming operation going); *In re Roberts*, 78 B.R. 536, 537–38 (Bankr.C.D.Ill.1987) (where debtor inherited farm she operates, estate taxes constitute debt arising out of farming operation because debt is incurred as result of acquisition of farming operation from decedent); *In re Rinker*, 75 B.R. 65, 68 (Bankr.S.D. Iowa 1987) (debt incurred by debtors in settlement of will dispute over land farmed by them is debt arising out of a farming operation).

Here, debtors incurred a debt of $370,000 not in acquiring or retaining land they farm, or in financing their own farming activity, but rather in agreeing to co-sign a loan made to finance their grandson's farming operation. The record does not reveal, however, whether debtors, in addition to their function as co-signatories on the note, had any ownership interest, or

played any operational role, in the grandson's hog-raising enterprise. We vacate and remand so that debtors may have an opportunity to demonstrate such a relationship to that farming operation. The $370,000 debt cannot be counted toward satisfaction of § 101(17)(A)'s debt requirement unless debtors show such a relationship.

The courts below evidently believed that debtors are entitled to statutory "family farmer" status since they have lived on their acreage for many years and continue to conduct traditional farming activities on a limited basis. Courts, however, are not free to confer statutory "family farmer" status upon individuals simply because they reside on a farm and carry on some farm-related tasks. That an individual may seem to be a family farmer in the colloquial sense of the term does not mean he or she is a family farmer for purposes of the Bankruptcy Code. For the reasons we have discussed in this opinion, the judgment of the District Court is vacated and the matter remanded for further proceedings consistent with this opinion.

HANSON, Senior District Judge, concurring in part and dissenting in part.

I wholeheartedly agree that the protections afforded by Chapter 12 of the Bankruptcy Code extend only to those debtors who fall within the definition of "family farmer" found at 11 U.S.C. § 101(17)(A). I disagree, however, with the majority's analysis of this provision and with their characterization of the actions of the courts below as conferring "statutory 'family farmer' status upon individuals simply because they reside on a farm and carry on some farm-related tasks." The courts below found statutory "family farmer" status because their review of all of the circumstances surrounding the Eastons' farming operation established that the rental arrangements should be considered an integrated part of this enterprise—a holding which I find is consistent with both the text and intent of the statute at issue. Thus, I write separately to explain my dissent from the majority's characterization of the law. I concur in the remand, though, because I

believe it will further strengthen the record establishing the Eastons' rights to chapter 12 protection.

The provision of the bankruptcy code at issue requires that more than 50% of debtors gross income for the taxable year preceding the year of their filing come from a "farming operation" owned or operated by debtors. 11 U.S.C. § 101(17)(A). This provision was added to the Code as part of the Family Farmers Bankruptcy Act of 1986, Pub.L. 99–554, § 255, 100 Stat. 3105–3114. This law created a new chapter of the Bankruptcy Code aimed at providing additional protections to family farmers caught in the agricultural crisis which began in the early 1980's. *See In re Welch*, 74 B.R. 401 (Bkrtcy.S.D.Ohio 1987). Such a law was necessary because of the "difficulties farmers encountered in seeking to reorganize under" the other provisions of the Bankruptcy Code. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 970, 99 L.Ed.2d 169 (1988). The specific provisions at issue in this case were enacted by Congress to "ensure that only family farmers—not tax shelters or large corporate entities—will benefit" from the protections available through the newly created chapter 12. 132 Cong.Rec. S15076 (daily ed. Oct. 3, 1986) (statement of Sen. Grassley).

All parties agree that debtors meet the 50% requirement in 1986, the year at issue, only if the cash rent received from the Ritz's is considered income from the Eastons' farming operation. The bankruptcy and district court both found that this income did qualify as income from their farming operation in this case. The courts made this conclusion based on a review of the "totality of the circumstances" surrounding the rental arrangement.

The majority rejects these holdings finding the "totality of the circumstances" test inappropriate for determining "whether money an individual receives from a given source is income 'from such farming operation' within the meaning of § 101(17)(A)." I believe the majority errs in dismissing this test because the definition of farming operation enacted in law by Congress necessitates this type of fact specific inquiry.

This provision, in its entirety, states that " 'farming operation' includes farming, tillage of the soil, dairy farming, ranching, production of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(20) (Supp. V 1987) (emphasis added).

The use of the general phrase "farming" as the first example of an activity which constitutes a "farming operation" is important for two reasons. First, "farming" is an ambiguous description in comparison to the other description of activities in the statute as the phrase relates more to a concept than it does to a specific activity. Thus, by using this phrase Congress indicated that it did not intend to limit the definition of a farming operation solely to the specific activities listed after "farming". Otherwise there would have been absolutely no reason to include the phrase farming in the definition. We do not infer such an intent on Congressional action. Instead, "[i]n construing a statute we are obliged to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979).

Secondly, the phrase "farming" also envisions a pattern of activity. Thus, courts should not automatically break down all of the actions of someone engaged in farming into separate components before determining whether these activities constitute farming. Some of the actions are more properly viewed in context with each other. For example, although the sale of farm equipment does not appear to be farming when viewed in isolation, it may indeed be farming when viewed in the context of all the other activities and circumstances of the debtor. *Matter of Armstrong*, 812 F.2d 1024, 1026 (7th Cir.1987) (holding that as definition of "farming operation" in Bankruptcy Code begins with general term "farming" it is implicit that definition includes general activities inherent in farming and in perpetuating the farming operation), *cert. denied*, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 248 (1987).

Thus, contrary to the majority's assertions, embracing the "totality of the circumstances" test will not result in "no readily discernible limiting principle". It will simply allow the bankruptcy courts, in the appropriate circumstances, to look at a farming operation as a whole without dissecting it into the smallest possible divisions. The majority's failure to recognize this, I fear, will put a straitjacket on the bankruptcy courts which will disable them from being able to fully provide the relief Congress envisioned.

Accordingly, I disagree strenuously with the majority's suggestion that a farmers renting out of a portion of his land, by itself, can never be considered part of a farming operation. The "leasing of farm land, for either cash or a crop share, has been an integral part of many family farm operations throughout this country for years," as has the practice of custom farming, in which a farmer hires all the farm labor done for him. *In Re Mikkelsen Farms, Inc.*, 74 B.R. 280, 285 (Bkrtcy.D.Or. 1987). Indeed, the definition of the verb "farm" is "[t]o lease or let; to demise or grant for a limited term and at a stated rental. To carry on business or occupation of farming." *Black's Law Dictionary* 545 (5th Edition 1979). Thus, bankruptcy courts are acting entirely within their discretion when they consider all of the circumstances surrounding a rental agreement to determine whether the income generated is from the debtor's farming operation. Indeed, it seems logical that Congress specifically chose the phrase "farming" in order to give the bankruptcy courts sufficient discretion to target relief to their intended beneficiaries.[1]

A compelling explanation of why a fluid definition of farming is appropriate is

---

1. The suggestions by the majority that the use of the totality of the circumstances test would allow a court to confer family farmer status on a land-holder who has no other attachment to farming evidences a complete misunderstanding of the concept of weighing all of the circumstances. A court weighs all the circumstances to see if rental agreements are part of a farming operation. If all there are, are rental arrangements, then there is no farming operation for these arrangements to be part of.

found in *Matter of Burke*, 81 B.R. 971 (Bkrtcy.S.D.Iowa 1987). In this case Judge Jackwig recites the following fact pattern as a prime example of those farmers which Congress intended to help:

> A familiar example is the "financially distressed farm family" of four who began farming in the mid–1960's, first renting then purchasing land. During the prosperous late 1970's, the family purchased additional land for a price in excess of $2,000.00 per acre. Subsequent high interest rates, foreign production, domestic overproduction, depressed markets and the value of the dollar combined to depress commodity prices. The farm no longer was able to generate sufficient income to service its debt. Some production lenders cut off credit. To make ends meet, the husband and wife obtained at least part-time employment off the farm. Some or all of the land was leased.

*Id.*, 81 B.R. at 976.

There is every indication that Congress was fully aware that many farmers were facing this type of situation, and that some were being forced to rent out all or part of their farmland because of problems securing credit for putting in a crop. There is, however, no evidence that Congress intended chapter 12 to be unavailable to such farmers. Thus, I refuse to give an unnecessarily narrow reading to the phrase "farming" when the effect would be to deny relief to the very people Congress sought to help, especially when such a reading is at odds with both the legal definition of the term and with the past and present realities of farming.

Further, I must note that it is established law in this circuit that findings of fact by a bankruptcy court are not to be overturned unless they are clearly erroneous. *In re Martin*, 761 F.2d 472 (8th Cir.1985). The majority, though, fails to give such deference to the court below. Instead, they analyze the issue as a purely legal question. The issues of whether a practice constitutes farming and of whether income is from a farming operation, however, are factual inquiries which Congress put in the hands of the bankruptcy courts, not the appellate courts. Thus, it is error for this court to pre-empt the bankruptcy courts' jurisdiction to determine these issues.

I agree that those operations in which the agricultural landlord is completely non-active with regard to any other farming activities and which are purely pass-through operations are not eligible for chapter 12. This, however, is not such an operation. Instead, the record shows that the Eastons have already established their right to the protections of chapter 12. I concur in the remand simply because I believe an even stronger record can be established. Thus, my concurrence does not extend to the majority's representation of the law, or to the hurdles which the majority says the Eastons must jump to get chapter 12 protection. Accordingly, I urge the courts below to explore all evidence indicating that the rental arrangements are an integral part of the Eastons' farming operation, as well as exploring all ways in which the Eastons influence, direct and participate in the stewardship of the portion of their farm which they rent out to others for cultivation.

I also note that it is not clear to me that the issue of whether debtors meet the 80% debt requirement is properly before this court. Appellants first raised this issue in a motion to alter or amend judgment after the bankruptcy court had ruled that debtors were family farmers within the meaning of the bankruptcy code. This judgment was issued after the bankruptcy court held a hearing on appellant's motion to dismiss based on the allegation that debtors were not family farmers within the meaning of the bankruptcy code. Appellants never raised the debt issue in their motion to dismiss, during the hearings on the motion, or in their post hearing submission. This fact led the bankruptcy court to challenge the legitimacy of raising the issue in the motion to amend judgment. *See* Transcript of Nov. 30, 1987 Hearing at 29.

Specifically, the court ruled from the bench that the debt issue "wasn't even raised in the motion to dismiss. And I guess I have a problem with revisiting the

motion over and over again. * * * And to—to come in and raise it in the context of a motion to amend I think is improper because the facts—I don't think it has any merit, and so I am going to renew my ruling denying the motion to dismiss subject to the—to what I have just stated." *Id.* The Court went on to discuss why it thought the claim was meritless even if properly raised.

Accordingly, I question whether this claim is properly before us. It may be that after fully examining the issue we would find that the debt question is a jurisdictional issue which could be raised at any time, or that the issue was properly presented to the court below. However, I find it necessary to jump at least one of these hurdles before addressing the issue. Thus, I concur in the remand of this issue to give the courts below the opportunity to examine whether this is still a "live" issue, as well as to produce evidence indicating the extent to which the Eastons' and their grandson's farming operations were commingled with regard to the hog-raising enterprise. In my view this would include all evidence indicating that it was the intent of the Eastons to bring their grandson into their farming operation through this joint venture with him.

Finally, it is misleading for the majority opinion to refer to George and Elsie Easton as being "basically retired from farming". The Eastons are engaged in a substantial cow/calf cattle raising operation for which they alone provide all labor. Transcript of May 12, 1987 Hearing at 5. In 1986, the operative year under the bankruptcy code, approximately 170 acres of the Eastons' land were devoted solely to this enterprise. Thus, the Eastons are not "basically retired from farming", nor are they merely carrying on "some farm-related tasks". They are fully and actively engaged in the enterprise of farming. It is also somewhat misleading for the majority to refer to the Eastons' farm of more than 400 acres as "their acreage".

In closing I note one last irony. In *Norwest Bank Worthington v. Ahlers*, 108 S.Ct. 963, the Supreme Court reversed a decision by this court on the grounds that we had failed to adhere to the then applicable bankruptcy code. The Court wrote "relief from current farm woes cannot come from a misconstruction of the applicable bankruptcy laws, but rather, only from action by Congress." 108 S.Ct. at 970. Congress, fortunately, did act and created an entirely new chapter aimed at farmers like the Eastons. Today, however, this court enacts an obstacle in the path of such farmers through an interpretation of the phrase "farming" which is in no way necessitated by the statute Congress passed. On this aspect of the opinion I must dissent.