**In re George Roger EASTON and Elsie M. Easton, Debtors.**

**Bankruptcy No. L–87–00345S.**

United States Bankruptcy Court, N.D. Iowa.

July 23, 1990.

John Harmelink, Yankton, S.D., for debtors.

Karen McCarthy, Mayne & Berenstein, Sioux City, Iowa, for Otoe County Nat. Bank.

Carol F. Dunbar, Waterloo, Iowa, Chapter 12 Trustee.

## ORDER RE: Remand

MICHAEL J. MELLOY, Bankruptcy Judge.

The Court conducted a further evidentiary hearing in connection with the remand of this case from the Eighth Circuit Court of Appeals. The Court, having heard the evidence and testimony and having reviewed the briefs and arguments of counsel, now enters the following findings of fact, conclusions of law and order.

The issues before the Court are whether more than 50% of the Debtors' 1986 income was farm income and whether more than 80% of the Debtors' indebtedness was farming debt for purposes of the eligibility tests under 11 U.S.C. §§ 101(17) and 109(f). Based upon the legal standards set out by the Eighth Circuit in the case of *In re Easton*, 883 F.2d 630 (8th Cir.1989), the Court finds that the Debtors do meet the eligibility requirements for relief under Chapter 12 of the Bankruptcy Code.[1]

## Background

The background of this case is set forth in detail in the Eighth Circuit's opinion in *In re Easton*, 883 F.2d 630 (8th Cir.1989). In that opinion, the Eighth Circuit reversed this Court's decision that the Debtors were eligible for Chapter 12 relief. The Eighth Circuit remanded the case to this Court for the purpose of making further findings as to the Debtors' eligibility pursuant to the legal standards set forth in the *Easton* opinion.

The issue of the Debtors' eligibility for Chapter 12 relief is before the Court on a motion to dismiss by Otoe County National Bank ("the Bank"). This Court overruled the Bank's motion and eventually confirmed the Debtors' plan. The Bank appealed that decision to the district court, which affirmed. Upon appeal to the Eighth Circuit, the Court reversed and re-

---

1. All references to statutory sections in this order are to Title 11 of the U.S.Code, unless otherwise indicated.

manded for further consideration of the eligibility issue.

### Findings of Fact

1. George Roger Easton and Elsie M. Easton ("the Eastons") filed their Chapter 12 petition on February 13, 1987. On the date of filing George Easton was 74 and Elsie Easton was 73.[2] They had lived on their farm in Plymouth County, Iowa since 1942.

2. The Easton's financial difficulties arose, to a large extent, from their involvement with their grandson's hog operation. Rick Easton, the grandson of George and Elsie Easton, wanted to build a hog confinement facility in 1982. He initially contacted the Iowa Family Farmer Development Agency about obtaining a loan for the facility. He was advised that a loan had been approved through that agency and that work on the hog confinement facility could begin.

3. One of the requirements for construction of the hog confinement facility was that Rick Easton would own the real estate upon which the facility was to be built. Consequently, George and Elsie Easton sold a two acre parcel of real estate to Rick Easton for $20,000. George and Elsie Easton took back a note from Rick Easton for the $20,000 purchase price. None of the $20,000 has ever been paid. The two acre parcel is located immediately adjacent to the home site of George and Elsie Easton and is completely surrounded by land owned by George and Elsie Easton. Rick Easton and his wife, Merrilee, live in a mobile home on the George and Elsie Easton property immediately adjacent to the two acre site where the hog confinement facility was built. The financing through the Iowa Family Farmer Development Agency did not involve any financial obligation by George and Elsie Easton other than the $20,000 note they took back for the sale of the two acre parcel.

4. As the hog confinement facility was being built, problems arose with the financing. For reasons that are not significant to this opinion, the financing eventually fell through. As a result, the contractors who built the hog confinement facility were not paid and Rick Easton did not have the necessary financing to pay them.

5. Various methods of alternative financing were explored in connection with the hog confinement facility. The concept of a lease/purchase arrangement was considered. Eventually, the Bank became involved and agreed to purchase the facility, pay off the contractors, and enter into a lease/purchase agreement. Prior to the Bank's involvement, there had been no request to involve George and Elsie Easton in the financing of the hog confinement facility.

6. As part of the financing arrangement, the Bank required George and Elsie Easton to become parties to the lease agreement and to give a second mortgage on 160 acres of farm land as security for the leasehold obligations. The 160 acres included the Easton's home and building site. The Eastons agreed to those conditions, became parties to the lease agreement, and pledged their real estate as security for the lease obligations.

7. The lease agreement dated October 27, 1983 is between the Bank, as lessor, and George Roger and Elsie M. Easton and Rick L. and Merrilee Easton, as lessees. The agreement provides for the leasing of a 24 crate hog confinement building and related equipment. The lease term is for seven years and requires semi-annual payments of $30,508.63. The lease also provides that the lessees are to purchase the equipment at the end of the lease term for the sum of $27,500. The final payment of $27,500 was paid as a deposit at the time of the signing of the lease. It is the Court's understanding that under the terms of the lease agreement, if all of the semi-annual payments had been made, the property would have been owned by the lessees at the end of the lease term without further payment, since the final payment of $27,500 was paid at the commencement of the

---

**2.** George Roger Easton died on April 9, 1989. The witnesses who testified as to his farming activities were Elsie Easton, Rick Easton, and Larry Ritz.

lease.[3] Although a bill of sale was never introduced into evidence, it is the Court's understanding that a bill of sale was signed transferring title to the equipment which is the subject of the lease agreement to the Bank. The Bank did not obtain title to the underlying two acre parcel of real estate; title to that parcel remained in the name of Rick Easton.

8. George and Elsie Easton and Rick and Merrilee Easton defaulted on their obligation to make payments under the lease agreement. Demand for payment was sent to all four lessees. Suit was eventually commenced against all four lessees in connection with the unpaid obligations under the lease agreement.

9. The Eastons owned a total of approximately 520 acres of land. In 1986, 60 acres of tillable land were rented to their grandson Rick Easton and 290 acres of tillable land were rented to a neighbor, Larry Ritz. George Easton raised cattle on the remaining 170 acres of pasture land and derived income from the sale of that cattle. It is undisputed that more than 50% of the Easton's income for calendar year 1986 was derived from the cash rent of their real estate to Larry Ritz. The Debtors' eligibility for Chapter 12 relief under the 50% income test will rise or fall upon a determination as to whether the Ritz rent represents farm income for 1986.

10. Although George Easton was in his early 70's in 1986, he was in good health and worked a full day around the farm. George Easton owned and raised 45 stock cows, 2 bulls, and 43 calves in 1986.

11. Rick Easton testified as to a typical work day spent by his grandfather around the farm. George Easton usually worked the entire day. He would get up in the morning and the first thing he would do is go out and feed the cattle, make sure the cattle had water, and check the fences. He would then go in and have his breakfast. George would then go back out and perform whatever other chores were needed in connection with the cattle. He would then usually help Rick with his activities around the hog farrowing facility. His activities included help in raising the pigs, feeding the sows, feeding baby pigs, power washing the hog house, clipping teeth, and any other chores which needed to be done around the hog house. George Easton continued these activities throughout the day, stopping only for his lunch break.

12. George Easton also helped Rick with the field work on the land Rick was renting from George and Elsie Easton. George Easton would cultivate corn and soybeans, chop silage, mow weeds, walk beans,[4] spray and mow fence lines, and mow set aside acres. He also drove loads of corn and soybeans at harvest time.

13. George Easton's motivation in helping his grandson extended beyond ordinary parental concern. George and Elsie Easton had a direct financial interest in seeing that Rick Easton's farming operation was successful. In particular, George's activities in the hog operation were designed, in part, to help Rick make his operation successful, and thus hopefully make it easier for Rick to make payments to the Bank under the lease agreement.

14. Rick Easton and Larry Ritz both testified concerning the rental arrangement with Larry Ritz and George Easton's activities in connection with the land rented to Mr. Ritz. The Ritz lease involved 290 acres, of which 160 acres were rented for $80 per acre and 130 acres were rented for $85 per acre. One-half of the annual cash rent was due on March 1, 1986; the other half was due on December 1, 1986. The Eastons had a similar rental arrangement

---

3. The Bank has not contended in these proceedings that this agreement is a true lease agreement which requires acceptance or rejection pursuant to 11 U.S.C. § 365. Throughout this Chapter 12 case this agreement has been treated as a financing device. The Bank perfected its interest in the lease agreement by filing a Uniform Commercial Code Financing Statement with the Iowa Secretary of State.

4. "Walking beans" was not explained during the hearing. However, the Court understands that phrase to be a colloquial expression for the act of walking between the rows of soybeans in the soybean field and manually pulling or cutting the weeds that grow up among the soybeans.

with Mr. Ritz in 1985 and 1987. Although Mr. Ritz did not pay all of the rental payments on time (and in fact the first payment was spread out over several months after March 1st), all of the 1986 cash rent was eventually paid during calendar year 1986.

15. Larry Ritz had his own financial difficulties. He had a large farming operation which had gone through a Chapter 11 proceeding in 1982. He obtained confirmation of a Chapter 11 plan in 1983. However, he was still experiencing financial difficulties in 1986 and was struggling to meet his financial obligations.

16. George Easton and Larry Ritz had an unusually close relationship. Larry Ritz had previously custom farmed the George Easton land for a number of years. Larry Ritz testified that he felt his relationship to George Easton was more in the nature of a father/son relationship than that of neighbors or landlord/tenant. Larry Ritz and George Easton conversed frequently and discussed a number of subjects, including Larry Ritz' farming of the George and Elsie Easton real estate.

17. The lease agreement between the Eastons and Larry Ritz did not impose upon the Eastons any obligation to do any work on the land being leased, nor did it give the Eastons any control over how the land was to be farmed. However, Larry Ritz and George Easton met frequently to discuss how the land was to be farmed, and Larry Ritz attempted to comply with George Easton's wishes. The property was enrolled in a government program which meant that 20% of the corn base had to be put in the set aside program. The government program essentially dictated the number of corn set aside acres with the remaining acres planted to soybeans.

18. Although the Eastons had no obligation under the lease agreement to perform any activities on the land leased to Larry Ritz, George Easton did perform significant functions in connection with the rental property. These activities included seeding and mowing the set aside acres. George Easton fenced those set aside acres and grazed his cattle on them when permitted under the government program. George Easton also mowed the roadside, took care of weeds, and did general fencing chores. In 1986, George Easton also walked the beans, thus improving the value of the bean crop. George Easton's motivation in walking the beans, which is not a typical landlord activity, was in some dispute. However, it is clear that removing weeds from the bean crop would generally improve the yield, thus making it easier for the tenant who would be receiving the crop proceeds to make the rental payments.

Discussion and Conclusions of Law

A. Income Test

This Court must identify those farming activities "engaged in or owned or operated by someone claiming statutory 'family farmer' status and then determine whether that individual received more than 50% of his or her gross income in the relevant year from those activities." *In re Easton*, 883 F.2d at 633. In making this determination, the Eighth Circuit indicated that the Debtors were to demonstrate "that the money they received from Larry Ritz is in fact proper § 101(17)(A) income under the legal standard we have set forth in this opinion. Those sums cannot be counted as § 101(17)(A) income unless debtors show that they had some significant degree of engagement in, played some significant operational role in, or had an ownership interest in the crop production which took place on the acreage they rented to Larry Ritz." 883 F.2d at 636.

There is no dispute that George and Elsie Easton had no ownership interest in the crop produced on the acreage rented to Larry Ritz. The agreement with Larry Ritz was a cash rental arrangement which required Larry Ritz to pay the cash rent regardless of the crop yield. The inquiry thus turns to whether the Eastons had some significant degree of engagement in, or played some significant operational role in, the crop production on the land rented to Larry Ritz.

It is clear that George Easton had some degree of engagement in the production of those crops. He walked beans which

helped to enhance the yield from that real estate. He also mowed weeds, mended fences, and seeded and maintained the set aside acres. The issue the Court must determine is whether that operational activity was "significant."

On the basis of the record, it is this Court's conclusion that George Easton played a significant operational role and had a significant degree of engagement in the production of the crops on the land rented to Larry Ritz. The testimony is clear that George Easton's activities in walking the beans were not those of a typical landlord under a cash rental arrangement. Whether George Easton's motivation was to help increase the yield (which it did) so as to make it easier for Larry Ritz to make his payments, or whether the activity resulted out of the unusually close relationship between George Easton and Larry Ritz, or whether the activity resulted from George Easton's stewardship of his land, the fact remains that he did engage in activities which are not normally associated with a cash rent landlord. While the other activities, i.e., planting and maintaining the set aside acres, maintaining the fences, and mowing the roadside, are not as directly related to the production of crops as walking the beans, these are also significant activities which were of benefit in the proper cultivation of the rented land.

The Court also believes that support for this position can be found in the following statement from the Eighth Circuit's opinion: "[I]n our view it is entirely possible that the cash rent Armstrong [referring to the case of *In re Armstrong*, 812 F.2d 1024 (7th Cir.1987)] received from his tenant farmer could properly be characterized as § 101(17)(A) income because there was some evidence suggesting that Armstrong engaged in the cultivation of crops on the leased acreage. *See Armstrong*, 812 F.2d at 1027." *In re Easton*, 883 F.2d at 633. In the *Armstrong* case, the debtor had argued that he actively participated in the tillage of crops and provided fertilizer for the leased acres. The Eighth Circuit Panel indicates in the *Easton* opinion that such activities may qualify rental income as farm income for purposes of the income eligibility test. The Court believes that George Easton's activities are at least as significant as the types of activities referred to in the *Armstrong* case, so as to also qualify the rental income as farm income for George and Elsie Easton.

In conclusion, the Court finds that George Easton had a significant degree of engagement in, and played a significant operational role in, the production of crops on the land leased to Larry Ritz. Thus, the rental income from Larry Ritz is proper § 101(17)(A) income so as to qualify the Debtors for Chapter 12 relief.

## B. Debt Limitation Test

■ The second issue raised in this case is whether more than 80% of the indebtedness owed by George and Elsie Easton is farm debt. The definition of "family farmer" found at § 101(17)(A) states in part that a family farmer is an individual "whose aggregate debts do not exceed $1,500,000 and not less than 80% of those aggregate noncontingent, liquidated debts ... arise out of a farming operation owned or operated by such individual...." The issue before the Court is whether the debt evidenced by the lease agreement between the Bank and George and Elsie Easton is a debt which arises out of a farming operation owned or operated by George and Elsie Easton. If the Easton's $370,000 debt to the Bank is considered a debt arising out of a farming operation owned or operated by the Eastons, then the Eastons clearly meet the debt limitation test under § 101(17)(A). Conversely, if it is determined that the debt owed to the Bank does not arise out of a farming operation owned or operated by George or Elsie Easton, then the Eastons fall well short of the 80% debt requirement.

In its remand decision the Eighth Circuit sets out the following considerations which pertain to this issue:

Here, debtors incurred a debt of $370,000 not in acquiring or retaining land they farm, or in financing their own farming activity, but rather in agreeing to co-sign

a loan made to finance their grandson's farming operation. The record does not reveal, however, whether debtors, in addition to their function as co-signatories on the note, had any ownership interest, or played an operational role, in the grandson's hog-raising enterprise. We vacate and remand so that debtors may have an opportunity to demonstrate such a relationship to that farming operation. The $370,000 debt cannot be counted toward satisfaction of § 101(17)(A)'s debt requirement unless debtors show such a relationship.

883 F.2d at 636–37.

The Court would first note that it is somewhat troubled by the terminology "co-signor". When the Bank filed its original motion to dismiss the Chapter 12 case of George and Elsie Easton, the debt limitation issue was not one of the grounds alleged in support of the motion to dismiss. No evidence or testimony was presented at the original hearing on the nature of the lease arrangement between the Bank and the Eastons. Throughout the proceedings, however, George and Elsie Easton were frequently referred to as co-signors or guarantors of their grandson's indebtedness. In the remand hearing, where the record was more fully developed, it became clear that George and Elsie Easton are the principal obligors on the lease agreement with the Bank. Their names are the first names listed as lessees. There is nothing in the lease agreement to indicate that they are signing in any capacity other than principal lessees. The lease agreement form contains a separate section for signatures by guarantors. That section is left blank in the Easton agreement.

It is somewhat unclear as to what significance, if any, the Eighth Circuit may have placed upon the assumption that George and Elsie Easton were co-signors or guarantors of the lease. In the consumer credit area, the term "co-signor" is generally used synonymously with "guarantor." See, e.g., § 537.3208, 1989 Code of Iowa. It is clear that George and Elsie Easton are not co-signors if that term is construed to mean that they are guarantors or in any way have a secondary liability under the lease agreement. The agreement is clear that they are the principal obligors and are principally liable to the Bank under the lease agreement.

■ The Court's discussion concerning the status of George and Elsie Easton as principal obligors is relevant for two reasons. First, there is the issue of whether the debt in question is contingent or unliquidated. Since George and Elsie Easton are principal obligors, their obligation is not contingent upon any default by Rick and Merrilee Easton, and thus is not a contingent liability. That fact, coupled with the fact that the Bank gave notice of default, accelerated the debt, and commenced a suit, leads the Court to conclude that for the purposes of § 101(17)(A) the debt owed to the Bank is noncontingent and liquidated.

The second issue relates to the question of ownership. It is not at all clear to the Court who would have owned the hog confinement facility at the end of the lease term. It was clearly the original intent of George, Elsie, and Rick Easton that the hog confinement facility would be built and owned by Rick and Merrilee Easton. However, under the terms of the lease agreement, the lessees are George and Elsie Easton and Rick and Merrilee Easton. Arguably, title to the hog confinement facility would have transferred to all four persons upon full payment under the lease. Since the lease agreement was actually a security agreement related to the purchase money financing of the hog confinement facility, it can be argued that George and Elsie Easton were involved in the purchase of the facility, and thus have an ownership interest in the property which generated the debt to the Bank.

However, the Court does not believe it is necessary to decide the ownership interest issue, since the Court finds that under the test outlined by the Eighth Circuit, the Eastons played an operational role in their grandson's hog-raising enterprise. It is clear that George Easton was actively involved on a daily basis with the hog confinement facility and hog-raising activities.

George fed the hogs, made feeders, helped with the little pigs, power washed the hog house, and in general did whatever work was needed to help make a go of the hog operation. George worked in the hog house every day in order to help make the operation a success so the payments to the Bank could be made under the lease agreement. Given those facts, the Court believes that the Debtors have demonstrated that George and Elsie Easton played a significant operational role in their grandson's hog-raising activities. Thus, the debt to the Bank arose out of a farm operation operated by George and Elsie Easton so as to qualify that indebtedness for the 80% debt limitation under § 101(17)(A).

### Conclusion

In conclusion, the Court finds that the Debtors have shown that more than 50% of their income for calendar year 1986 arose out of a farming operation, and more than 80% of the debts which existed on the date of filing were the result of a farming operation operated by George and Elsie Easton. Therefore, George and Elsie Easton are found to be eligible for Chapter 12 relief.

### ORDER

IT IS THEREFORE ORDERED that the Motion to Dismiss filed by Otoe County National Bank is denied.