**In re Roger E. MILLER and Donna M. Miller, Debtors.**

**Bankruptcy No. L–90–00694D.**

United States Bankruptcy Court, N.D. Iowa.

Dec. 12, 1990.

Joseph A. Peiffer, Cedar Rapids, Iowa, for debtor.

Jeffrey Swartz, Waukon, Iowa, for John Hancock Mut. Life Ins. Co.

Martin McLaughlin, Asst. U.S. Atty., Cedar Rapids, Iowa, for the U.S.

Carol F. Dunbar, Waterloo, Iowa, trustee.

MICHAEL J. MELLOY, Chief Judge.

*Ruling Re: Motion to Dismiss*

The matter before the Court is a motion to dismiss filed by John Hancock Mutual Life Insurance Company ("John Hancock"). John Hancock alleges two grounds in support of its motion to dismiss. First, John Hancock argues that the Debtors do not qualify as family farmers for purposes of Chapter 12 relief. Secondly, it is alleged that the Debtors have filed their Chapter 12 petition in bad faith. The motion to dismiss is granted on both of the grounds alleged by John Hancock.

### Findings of Fact

1. The Debtors in this case filed a Chapter 11 petition on August 14, 1984. That petition was filed in this district as case No. 84–01143.

2. John Hancock was one of the major secured creditors in the Debtors' Chapter 11 case. Eventually, the Debtors were able to negotiate agreed plan treatment with John Hancock. The terms of the agreement between the Debtors and John Hancock were incorporated into a plan of reorganization. An order was entered on February 5, 1987, confirming Debtors' Chapter 11 plan. The Chapter 11 plan was substantially consummated and a Final Decree was entered and the case closed on February 16, 1989.

3. Under Debtors' confirmed Chapter 11 plan, John Hancock was treated as a fully secured creditor. The negotiated plan treatment provided that a substantial portion of Debtors' farm real estate, which secured the John Hancock debt, would be deeded over to John Hancock. In return, John Hancock would give Debtors credit against the debt owed to John Hancock in an agreed upon amount. Any remaining indebtedness owing after the agreed upon credit was applied to the John Hancock debt, would be secured by the remaining real estate owned by the Debtors. The remaining John Hancock debt would accrue interest at the contract rate of 13.5% per annum, payable in equal monthly installments, computed on a 20.5 year amortization with a balloon payment of the remaining principal balance, plus accrued interest on October 1, 1989. The interest rate and balloon payment in the confirmed plan were the same as the terms of the original note and mortgage between the Debtors and John Hancock.

4. The closing on the conveyance of the real estate to John Hancock occurred prior to the entry of the confirmation order. Plaintiff's exhibit "9A–9H" is a copy of the closing statement and acknowledgment of remaining debt. That document, which is dated November 28, 1986, indicates that the total indebtedness as of that date was $466,372.01. That sum included abstracting costs, attorneys fees, and all interest accrued through November 28, 1986. After crediting the agreed upon sum of $317,-000, the remaining debt was $141,532.87. The remaining indebtedness was the amount which was to be paid pursuant to the confirmed plan. In computing the indebtedness owed, John Hancock applied its default rate of interest of 17.5% to the date of closing. The remaining unpaid indebtedness is approximately double what Debtors estimated the remaining indebtedness to be in their plan and disclosure statement. The Debtors attribute this increase in their remaining indebtedness to a delay in consummating the agreement between the Debtors and John Hancock. The agreement between John Hancock and the Debtors had been reached approximately one year prior to the actual closing of the transaction.

5. Once the plan was confirmed, the Debtors had difficulty making monthly payments. However, sporadic payments were made during 1987, 1988 and 1989.

Eventually, the Debtors defaulted on their obligations to John Hancock and John Hancock obtained relief from the automatic stay in the Chapter 11 case. In the summer of 1989, the parties went through the farm mediation process. A mediation agreement was signed on July 26, 1989. The agreement required the Debtors to make a payment of $10,000 to John Hancock by August 15, 1989, and pay the remainder of their delinquent payments by September 15, 1989. The agreement also required the Debtors to obtain a purchase agreement for a house to be bought by the Debtors' son. If the Debtors did not comply with the agreement John Hancock would be free to commence foreclosure. The Debtors did sell the property in question to their son for $20,000. The proceeds from that sale were turned over to John Hancock, however, the $10,000 payment due on August 15, 1989, and the remainder of payments due on September 15, 1989, were not made.

6. John Hancock subsequently commenced foreclosure against the Debtors in the Iowa District Court on March 6, 1990. Shortly before the trial was scheduled in that case, the Debtors filed this Chapter 12 case on April 19, 1990. The filing stayed the foreclosure action pursuant to § 362 of the Bankruptcy Code.

7. The Debtors currently have three principal sources of income. The Debtors have a "traditional" farming operation in which they raise corn and soybeans. Mrs. Miller receives income through off-farm employment with the United States Department of Agriculture. In addition, the Debtors own several tracts of land upon which they grow timber. The Debtors cut the timber and operate their own sawmill. The timber is sawed into lumber and dried in kilns the Debtors operate as part of their sawmill business. The lumber is then sold for use in the construction industry.

8. The Debtors normally schedule their income from the logging and sawmill operation on schedule "F" of Internal Revenue Service form 1040, together with income from their traditional farming activities. The Debtors take the position that the log-

ging income is a form of farm income. However, some log sales are reported on schedule "D" as a capital gain. The Debtors were unable to separate out the income items on schedule "F" which represented sales of corn, soybeans, and other traditional farming revenue from the revenue the logging and sawmill operation produce. However, the Debtors were certain that more than one-half of their 1989 income was from traditional farming operations. The Court accepts this testimony and finds that more than 50% of Debtors' 1989 income is from the sale of corn, soybeans, and other traditional farming activities.

9. The small business administration ("SBA") has filed a proof of claim in this case in the amount of $203,736.96. The Debtors' scheduled total debt is $439,532.19. The time for filing claims has elapsed and proofs of claim filed by creditors in this case total $756,241.96. Using either the scheduled debt or the total of proofs of claim, the SBA debt is more than 20% of Debtors' total outstanding indebtedness. The Debtors concede that if the SBA loan is not considered a loan made for a farming operation the Debtors do not qualify for Chapter 12 relief.

10. The SBA loaned the Debtors money on April 23, 1983. The loan was made to Roger E. Miller d/b/a Miller Lumber Products and Dry Kiln. The loan was made for the purpose of allowing the Debtors to purchase the equipment and to construct the necessary buildings to operate the sawmill and kiln. The Debtors gave the sawmill equipment and a mortgage on a portion of the real estate they owned as collateral for the loan. The Debtors and SBA intended to keep this loan separate from the Debtors' farming operation. None of the farm equipment, livestock, or crops, were taken as collateral for the SBA loan. None of the loan proceeds were used for the traditional farming operation nor were any of the proceeds used to purchase logging equipment. All of the SBA loan proceeds were used in the sawmill operation.

11. An attorney employed on the legal staff of the SBA testified that at the time SBA made the loan to the Debtors, that

SBA was prohibited from making farm loans. This prohibition was not statutory and SBA had made farm loans in the past. However, SBA had adopted a policy prior to 1983 which prohibited SBA from making any farm loans. Consequently, SBA could not have made a farm loan to the Millers under the guidelines which were in effect at the time the SBA loan was made.

12. The SBA loan was treated under Debtors' confirmed Chapter 11 plan. The Debtors eventually defaulted on that obligation and much of the equipment which secures the SBA loan was sold with the proceeds being paid to the SBA. The Debtors' children purchased most of the equipment at the sale. The Debtors and the Debtors' children currently operated the sawmill and kiln business.

13. Since the Debtors' Chapter 11 case was confirmed, the Debtors have purchased two additional tracts of real estate. They purchased one tract from the Keith D. Elwick revocable trust. They made the purchase on real estate contract for $90,000 with an $8,000 down payment. They purchased the second parcel from the First National Bank of Sumner for $166,000. The down payment on that property was paid in two installments totalling $33,000. It is the understanding of the Court that the Debtors are current on both of those real estate contracts. The proof of claim filed by the First National Bank of Sumner shows that the Debtors made a payment to the Bank to bring that contract current on April 11, 1990. The Debtors testified that they purchased additional land so they would have an adequate supply of timber to conduct their logging and sawmill operations. The Debtors also testified that they logged enough timber from the First National Bank of Sumner property to make the down payment for that property as well as the down payment for the Elwick property. However, the Debtors also testified that the logging activities reduced the value of those properties down to an amount roughly equal to the current outstanding indebtedness.

14. It is somewhat difficult to determine exactly what has caused the Debtors' financial difficulty and inability to make plan payments under the Chapter 11 plan. The Debtors did testify that they had some crop shortfall as a result of the 1988 and 1989 droughts. However, they also testified that the droughts did not significantly impact upon their income because they had drought insurance and received drought relief payments. The Debtors also sued their former attorney, who handled the Chapter 11, for malpractice, and recovered a $10,000 payment and the right to extinguish the outstanding indebtedness they owed to the attorney. The Debtors also have enhanced their financial picture by winning $15,000 in the Iowa lottery. In addition, Mrs. Miller's off-farm employment generates approximately $20,000 of income per year. Mr. Miller also testified that lumber prices have continued to rise since the Chapter 11 plan was confirmed. The Debtors, however, have been unable to generate the amount of income they had originally projected for the Chapter 11 plan payments.

15. This Chapter 12 was generated principally by the Debtors' dissatisfaction with the agreements negotiated in the Chapter 11 case. As indicated above, the Debtors sued their former attorney for malpractice. The Debtors believe that a better deal could have and should have been negotiated with John Hancock to handle the John Hancock debt. The Debtors believe that the time for repayment should have been extended and the balloon date postponed beyond October, 1989. They also believe that annual payments which suit the needs of farmers should have been negotiated instead of the monthly payment obligations. Mr. Miller testified that he had talked to a banker about obtaining a loan which could have been used to refinance the John Hancock debt and meet the October, 1989 balloon payment debt. The Bank was willing to make such a loan, however, it would have required the Millers to pledge as additional security some of the real estate which had been purchased from the Elwick Trust and the First National Bank of Sumner, and to bring current all outstanding real estate taxes. Mr. Miller testified that he was unwilling to refinance

the debt on those terms. He preferred to file a Chapter 12 and to attempt to obtain a better deal with John Hancock in a new bankruptcy case.

16. The Debtors have filed a Chapter 12 plan in this case. That plan proposes to write down the debt of John Hancock from $149,186.67 (per proof of claim filed July 16, 1990) to $108,000 (which is stipulated as the fair market value of the real estate which secures the John Hancock debt) less the amount of any real estate taxes.

At the hearing on the motion to dismiss, the Debtors indicated that they would be willing to amend their plan to delete the requirement that the fair market value of the debt be reduced by the real estate taxes since those taxes are several years old and should have been paid under the Chapter 11 plan. Under this arrangement, the interest rate would be reduced to a rate equivalent to two percentage points above the rate in existence for 180 month treasury bonds at the date of confirmation. The secured claim also would be amortized over 30 years.

### Conclusions of Law

A. Chapter 12 Eligibility.

■ The first issue the Court must address is whether the Debtors qualify for Chapter 12 relief. Under 11 U.S.C. § 109(f)[1] only a family farmer with regular annual income may be a Debtor under Chapter 12. A family farmer is defined at § 101(17)(A) as follows:

individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $1,500,000 and not less than 80 per cent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual

and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed.

The debt owed to SBA is a noncontingent, liquidated debt. The issue before the Court is whether that debt, which represents more than 20 percent of Debtors' total outstanding indebtedness, arises out of a farming operation owned or operated by the Debtors. To answer this question, the Court must determine whether a sawmill operation which processes logs grown on Debtors' real estate constitutes a farming operation. The Court concludes that such activity is not a farming operation, and therefore the Debtors do not qualify for Chapter 12 relief.

The Eighth Circuit Court of Appeals has addressed the issue of eligibility for Chapter 12 relief in the case of *In re Easton*, 883 F.2d 630 (8th Cir.1989). In that case, the Eighth Circuit rejected the totality of the circumstances approach to determining family farmer status which has been adopted by a number of courts. 883 F.2d at 633. The *Easton* court found that farming refers to production of farm commodities. 883 F.2d at 634. This is consistent with the Bankruptcy Code definition of farming operation found at § 101(20). That section reads as follows:

"farming operation" includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an *unmanufactured state*." (emphasis added).

The Debtors have argued strenuously that growing and harvesting timber is a nontraditional farming operation and should be recognized as a farming activity. *See In re Sugar Pine Ranch*, 100 B.R. 28 (Bankr.D.Or.1989). The finding of the *Sugar Pine Ranch* court that logging is a farming operation is a very expansive view

---

1. All statutory references are to Title 11, Bankruptcy Reform Act of 1978 unless otherwise

indicated.

of farming activity. In this case, the Debtors own the land upon which the trees they harvest are grown. However, to take the Debtors' argument to its logical conclusion, any person with a chain saw and truck for hauling logs and who owns or rents any timberland would qualify as a farmer. The Court finds such an expansive view of farming to be troubling. However, assuming *arguendo*, that logging can constitute a farming activity, the operation of a sawmill is one further step removed from that logging activity and is beyond even an expansive view of a farming operation. The definition of a farming operation makes specific reference to the growing and cultivation of farm commodities in their unmanufactured state. The sawing, planing, and drying of lumber to be sold commercially, is clearly a manufacturing activity.

A pre-chapter 12 case analyzing the definition of farming activity, lends support to the Court's conclusion. In the case *In re Dakota Lay'd Eggs*, 57 B.R. 648 (Bankr.D.N.D.1986) the court had to determine whether the debtor was a farmer for purposes of ruling upon a petition for involuntary bankruptcy.

In *Dakota Lay'd Eggs*, the court extensively discussed the argument that " 'farming operation' denotes an overall business enterprise in which farming is accomplished, as opposed to particular farming functions or activities." 57 B.R. at 655. The court rejected such an "unfettered" definition of farming. The court concluded by indicating that each function operated by the individual who claims to be a farmer must be analyzed to determine whether the particular activity is a typical farming activity.

Applying that rationale to this case, again leads the Court to the conclusion that the operation of a sawmill is not a farming activity. Again, assuming *arguendo*, that raising and logging of trees is a farming activity, it does not necessarily follow that processing the logs is also a typical farming activity. In the *Dakota Lay'd Eggs* case, the court rejected the argument that the sale of feed is a farming activity, although feed is typically the end product when traditional farming products such as corn and soybeans are processed.

Based on the reasoning stated above, the Court concludes that the operation of a sawmill is not a farming activity. Consequently, since more than 20% of the indebtedness owed by the Debtors relates to the sawmill operation, the Debtors do not qualify for Chapter 12 relief.

### Dismissal for Bad Faith

John Hancock argues that the case also should be dismissed on the grounds that it is filed in bad faith. John Hancock argues that an individual may not be a debtor in two separate cases under two different chapters of the Bankruptcy Code. In support of its position, John Hancock cites a number of cases that have held that a Chapter 12 case cannot be filed while a Chapter 11 is still pending. *See, e.g., In re Hill*, 84 B.R. 623 (Bankr.E.D.Mo.1988) (Chapter 12 case filed while previously confirmed Chapter 11 case still pending); *In re Gerth*, 116 B.R. 167 (Bankr.D.S.D.1989) (Chapter 12 case filed while previously confirmed Chapter 11 case still pending); *In re Bodine*, 113 B.R. 134 (Bankr.W.D.N.Y.) (1990) (Chapter 12 filed while previously filed Chapter 7 still pending). The problem with John Hancock's argument is that all of the decisions cited dealt with cases where the previously confirmed Chapter 11 case or Chapter 7 case in which the debtor had received a discharge, were still pending when the Chapter 12 was filed. In this case, the final decree was entered and the Chapter 11 case was closed prior to filing the Chapter 12. Consequently, the cases that rely upon the proposition that a debtor cannot have two pending bankruptcy cases at the same time are inapposite.

At least two courts have taken the position that a Chapter 12 filing may follow the confirmation of a previously filed Chapter 11. In the case of *In re Culbreth*, 87 B.R. 225 (Bankr.M.D.Ga.1987) the court was faced with the same factual situation that exists in this case. The debtors previously had obtained confirmation of a Chapter 11 case, the plan was substantially consummated, and a final decree entered prior to the filing of the Chapter 12. In that case,

the court addressed the arguments raised by the objecting creditors and U.S. Trustee that the Chapter 12 filing was improper. The *Culbreth* court noted that it was not an uncommon practice for a debtor to receive a discharge in a Chapter 7 case and to then shortly thereafter file a Chapter 13 case, provided that the Chapter 13 filing was in good faith. The *Culbreth* court went on to conclude that since Congress was aware of this practice, it could have prohibited a family farmer from filing a Chapter 12 case once the farmer had dealt with his or her debts in the Chapter 11. However, the Chapter 12 legislation contains no such prohibition and it would be inappropriate for the Court to read such a prohibition into the law. *In re Culbreth*, 87 B.R. at 227. The court concluded that prior relief under Chapter 11 would not bar relief under Chapter 12, provided that the debtor is acting in good faith and has demonstrated a genuine need for the relief available under Chapter 12. *In re Culbreth*, 87 B.R. at 228.

More recently, the Ninth Circuit Bankruptcy Appellate Panel has addressed this issue in the case of *In re Grimes*, 117 B.R. 531 (9th Cir. BAP 1990). The *Grimes* court went one step further than the *Culbreth* court and held that a Chapter 12 case may be filed even if the originally filed Chapter 11 case remained open. The court there rejected the argument the debtor cannot maintain two cases simultaneously under the Bankruptcy Code. That court also noted that if Congress wanted to prohibit the filing of a Chapter 12 after the family farmer had dealt with his debts in a Chapter 11, it could have explicitly so indicated. Since Congress did not specifically prohibit the filing of a Chapter 12 case after a Chapter 11 plan has been confirmed, that court declined to read such a prohibition into the law. *Grimes*, 117 B.R. at 536–537 (citing *In re Culbreth*, 87 B.R. at 227).

The Seventh Circuit has addressed the issue of whether a new Chapter 11 case can be filed subsequent to obtaining confirmation of a previously filed Chapter 11. In the case of *In re Jartran, Inc.*, 886 F.2d 859 (7th Cir.1989), the debtor had obtained confirmation of a plan of reorganization,

and substantially consummated the plan. Then, 1½ years later, the debtor filed a second Chapter 11 petition which sought to liquidate the reorganized entity. The *Jartran* court concluded that there was no reason why a debtor could not file a second Chapter 11 plan for purposes of liquidating the reorganized debtor. The court felt that there may be valid and legitimate reasons why it may be preferable to liquidate through a new Chapter 11 proceeding instead of converting the old Chapter 11 case to Chapter 7. The court found that "there is no prohibition of serial good faith Chapter 11 filings in the Code ..." *Jartran*, 886 F.2d at 869.

The *Jartran* court placed great reliance upon the fact that the second Chapter 11 filing was a liquidating plan. One of the most troubling aspects of filing a new Chapter 11 or Chapter 12 after substantial consummation of a previously confirmed Chapter 11 plan is the Code's prohibition against modifying a confirmed plan that has been substantially consummated. *See* § 1127(b). The *Jartran* court noted that two bankruptcy courts had previously dismissed a debtor's Chapter 11 filing on the grounds that the second case was filed in an attempt to evade the clear prohibition against modification of a substantially consummated plan. *See In re AT, of Maine, Inc.*, 56 B.R. 55 (Bankr.D.Me.1985); *In re North Hampton, Corp.*, 39 B.R. 955 (Bankr.E.D.Pa.1984). The *Jartran* court found that filing a plan for purposes of liquidation is not an attempt to modify the terms of the plan, but rather a good faith admission that the debtor was unable to perform under the terms of the originally confirmed plan. The court noted a lack of good faith may constitute good cause for dismissal under § 1112(b), but filing of a second Chapter 11 solely for the purposes of liquidation is not *per se* bad faith. *Jartran*, 886 F.2d 869–870.

The authorities cited indicate that there is not a *per se* prohibition against successive filings. However, a successive Chapter 11 or Chapter 12 case cannot be used to evade the § 1127(b) prohibition against modification of a substantially consummat-

ed Chapter 11 plan. As in any Chapter 11 or Chapter 12 case, the debtor must show he or she is acting in good faith in formulating the successive Chapter 11 or Chapter 12 plan. *In re Jartran*, 886 F.2d at 869; *In re Kerr*, 908 F.2d 400, 404 (8th Cir. 1990).

 Several factors lead this Court to the conclusion that this Chapter 12 case has not been filed in good faith. The Court would first note that it does not appear the debtors "need" to file a Chapter 12 case. The court in *In re Culbreth* specifically noted that the debtors had "demonstrated a genuine need for the relief available under Chapter 12." 87 B.R. at 228. In this case it is not clear to the Court that the Debtors could not have made the payments provided for under the plan. In fact, while the Debtors did suffer the effects of the Iowa drought of 1988 and 1989, the Debtors' own testimony indicated that the drought did not have a significant impact upon their farming operation. Likewise, the Debtors testified that they could have refinanced their loan with John Hancock. Rather than do so, the Debtors chose to file the Chapter 12 case.

The Court also is troubled by the fact that the plan originally confirmed in the Chapter 11 case was a negotiated plan. The debtors are attempting to use this Chapter 12 filing to avoid what they now perceive to be a bad deal. It is the finding of this Court that filing of a successive Chapter 11 or Chapter 12 after substantial consummation of a previously confirmed Chapter 11 case for the sole purpose of renegotiating previously agreed upon plan treatment is an impermissible motive for filing the successive case.

Finally, the Court finds the conduct of the Debtors in this case to be troubling. While the Debtors were not paying delinquent real estate taxes, which are a prior lien to the John Hancock mortgage pursuant to the confirmed plan, and not paying the John Hancock plan payments, the Debtors were purchasing two tracts of land that required substantial down payments. In addition, the Debtors won a significant sum of money in the Iowa Lottery and received a settlement in a malpractice suit which should have enhanced their financial picture. Yet, the Debtors chose not to pay John Hancock, and to further impair John Hancock's position by not paying the real estate taxes. To the Court, this is further indicia of bad faith on the part of the Debtors.

In summary, the Court finds that this Chapter 12 has not been filed in good faith. Consequently, this finding constitutes an alternative ground for dismissal of the case.

### ORDER

IT IS THEREFORE ORDERED that the motion of John Hancock to dismiss Debtors' Chapter 12 case is granted.

DONE AND ORDERED.