**In re DELRAY ASSOCIATES LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 97–1–3542–DK.**

United States Bankruptcy Court,
D. Maryland.

Sept. 16, 1997.

Stephen E. Leach, Washington, DC, for Debtor.

Lawrence S. Jacobs, Rockville, MD, for Movant.

## MEMORANDUM OF DECISION

DUNCAN W. KEIR, Bankruptcy Judge.

Before the court is a Motion to Dismiss this Chapter 11 case filed by the holders of a note ("Movants") which is secured by a first deed of trust upon the sole significant asset of this debtor. Debtor's business and asset is an office building. This case, Case No. 97–1–3542 (herein after "Case No. 2"), was commenced on April 2, 1997, by the filing of an involuntary petition "against" the debtor by three petitioners. At the time of the filing of the involuntary petition and today, there was and is an outstanding Chapter 11 case filed by this debtor on July 3, 1991. In that case, Case No. 91–4–3233 (hereinafter "Case No. 1"), a confirmation of a Chapter 11 Plan ("Plan No. 1") was entered by the court on October 19, 1993. Plan No. 1 has not been fully performed, particularly as to the treatment of the Movants' claim, although the plan is substantially consummated. Movants seek the dismissal of Case No. 2 on the basis that it is a serial filing on behalf of the debtor and that it is filed in bad faith.

In order to decide the issues raised, the court must examine in detail the facts and circumstances of the filing of Case No. 2, as reflected by the evidence introduced during two days of evidentiary hearings.

Case No. 1 was filed by the debtor to prevent a foreclosure by the Movants of their first deed of trust. Treatment of Movants' claim under Plan No. 1 provided that the Movants would receive interest only for a period of approximately three and 1/2 years and then would be paid in full in March of 1997. Initially, the interest amount to be paid was less than the interest rate accrual called for under Plan No. 1, thus the balance

due actually increased during the first part of the plan. This treatment is sometimes referred to as a negative amortization.

Having averted foreclosure and provided in Plan No. 1 for an extension of the defaulted loan upon such favorable terms, the debtor made the interest payments called for under the plan until March of 1997. However, debtor defaulted upon payment of real estate taxes as they became due on the property in 1996. From the testimony of Gerald Wade, general partner of the debtor (hereinafter "Wade"), it was shown that the reason for the tax default was insufficient income from the property. Although in questioning Wade, counsel for the debtor suggested in his questions that the fortunes of the debtor improved sufficiently to allow the debtor to cure the tax default, upon questioning by the court, Wade testified that the debtor accumulated the funds to pay the open taxes and avert foreclosure by defaulting upon payments due to the second trust holder on the property. Thus, the court must find that as late as 1996, the property was not consistently cash flowing in an amount to pay current bills plus plan payments.

In March of 1997, the debtor defaulted on the last interest payment due to Movants under Plan No. 1. Debtor also failed to pay the full balance when it became due. The Movants instituted a foreclosure proceeding and again a bankruptcy was filed to stay the foreclosure. The petition filed was an involuntary petition signed by three entities purporting to be creditors and purporting to hold claims in conformity with the requirements of Section 303 of the Bankruptcy Code.[1] During the immediate post-petition period in Case No. 2 and before an order for relief was entered, the debtor did not make payments to the Movants and as a consequence amassed sufficient funds to advance a retainer to its bankruptcy counsel.[2] The

---

1. 11 U.S.C. § 303(b) states in part: "An involuntary case against a person is commenced by the filing of a petition under chapter 7 or 11 of this title (1) by three or more entities, each of which is a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute ... if such claims aggregate at least $10,000 more than the value of any lien on

property of the debtor securing such claims held by the holders of such claims...."

2. Although the stay imposed by 11 U.S.C. § 302(a) begins upon the filing of the petition, restrictions upon use of cash collateral take effect upon entry of the order for relief (unless imposed earlier by court order). 11 U.S.C. § 363.

debtor then filed a voluntary consent to an order for relief thus curing defects which existed in the involuntary petition.

In Case No. 2, the debtor has filed a plan ("Plan No. 2") which is virtually identical to Plan No. 1, with the exception that the due date for the balance of the Movants' claim is extended to the year 2004. Counsel for the debtor in his closing argument acknowledged that the plans were identical in substance, except for this one change.

■ Debtor argues that Case No. 2 cannot be considered a serial filing by a Chapter 11 debtor, as the petition was involuntary. This court disagrees. It is clear from the evidence, taking into account the demeanor and credibility of the witnesses, that the filing of Case No. 2 was completely orchestrated by the debtor. Further, it is clear that the reason for orchestrating an involuntary filing was for the purpose of creating the misleading and erroneous impression that Case No. 2 was not a voluntary entry into a serial filing by this debtor.

Debtor attempts to portray the involuntary filing as one in which the debtor had no part. This court finds nothing could be further from the truth and the attempt to portray such a scenario is disingenuous. Two of the three petitioning "creditors", Beta Construction ("Beta") and ARC Water Treatment Co. ("ARC"), were entities which had provided goods and services to the Delray project and to other projects managed by Pinnacle Realty ("Pinnacle"), the management company for this property. Beta and ARC were telephoned by a representative of Pinnacle and informed that the property might be sold at foreclosure. It was suggested to each that they would get a call from either counsel for the debtor or counsel for the second trust holder (the third petitioning creditor) and that participating in an involuntary bankruptcy petition might be in petitioners' best interest. Neither Beta nor ARC held an account receivable from the debtor which was in default at the time of these phone calls. Beta, a roofing contractor which had done work upon the property, held an outstanding invoice which was not overdue and indeed was paid in full by Pinnacle shortly after Beta signed the proffered involuntary

petition forms which were sent to it. At the time of the *filing* of the involuntary petition, Beta was not owed any money by the debtor. As to ARC, it is shown by exhibits that its monthly payments for water treatment bills were up to date when it was called by Pinnacle. Mr. Eric Hagen at ARC dug through old files involving Case No. 1 and from a copy of a ballot submitted upon Plan No. 1, inferred that there might be some historical unpaid amount that could be used as the pretext to claim creditor status on the involuntary petition. Mr. Hagen testified that he had no knowledge as to whether there was actually any outstanding unpaid balance.

These facts completely belie the canned question to Mr. Hagen on cross examination by counsel for the debtor, and response to the effect that ARC participated in the involuntary for the purposes of protecting its interests as a creditor. At the time of the filing of the petition, ARC did not even know whether it was a creditor, and if it was a creditor it was for a minuscule balance which had been owed years prior to the petition date. Although Mr. Jeremy Brown, for Beta, gave a similar response to the same question posed by debtor's counsel, Beta was not even a creditor when the petition was filed.

Counsel for the debtor also asked Messrs. Hagen and Brown whether they had received any telephone calls or had conversations with Wade. They responded that they had neither spoken with nor met Wade. This exchange was obviously intended to create an impression that the debtor had not participated in the communications soliciting the involuntary petition. Similarly, counsel for the debtor asked Wade whether or not he had ever called or spoken to anyone at either Beta or ARC concerning filing an involuntary petition and Wade's response to this question was no. However, upon questioning by the court, Wade *candidly admitted that he had called* Pinnacle and prevailed upon Pinnacle to research its files, attempt to identify creditors which might hold claims, and canvas such creditors in an attempt to get them to file an involuntary petition against Mr. Wade's partnership. Even more illuminating is the testimony of Mr. Rizzo, the Delray Building Man-

ager employed by Pinnacle, introduced by excerpts from transcripts of his deposition.[3] Mr. Rizzo testified: "I was asked [by Jerry Wade] to contact some contractors to see if they may be willing to participate in this in relation to the Chapter 11." Thus, the narrow questions addressed to Wade and Messrs. Hagen and Brown were clearly intended by the debtor to create an erroneous impression upon the court.

The court notes that Wade is not a stranger to the realm of Chapter 11 cases. He testified that he has held interests in a number of entities, some of which have filed cases before this court. This debtor, as already stated, has been here before and Wade has also been a debtor in a prior case.

After the calls from Pinnacle were made, attorney Helf on behalf of the second trust holder circulated the involuntary petition forms through correspondence which is also part of the evidence in this matter.[4] An interesting item appears at the bottom of those letters. The letters circulating the involuntary petition were copied to attorney Stephen Leach by attorney Helf. Mr. Leach is one of the attorneys for the debtor in both Cases No. 1 and No. 2. Whereas, normally an involuntary petition is a hostile act by creditors against a debtor, it is clear that the debtor both instigated this involuntary petition against itself, and its counsel was kept informed as to the circulation of the necessary forms instituting the strategy. At most, debtor's assertion that this was an involuntary case and therefore should not be counted as a second effort by the debtor is pretextual and would elevate form over substance, which this court will not do.

Under what circumstances should such a serial filing of a Chapter 11 case be dismissed and creditors allowed to exercise their non-bankruptcy legal rights? Some jurisdictions apply a per se rule against serial filings by debtors at a time when a prior case remains open. See, for example, *In re Caperoads Plaza Ltd., Partnership*, 154 B.R. 614, 615 (Bankr.D.Mass.1993), stating "[t]here is nothing in the Bankruptcy Code expressly prohibiting a debtor from having two cases pending at the same time. However, ever since *Freshman v. Atkins*, 269 U.S. 121, 46 S.Ct. 41, 70 L.Ed. 193 (1925), it has generally been held that simultaneous cases are prohibited."[5] Other courts have rejected a per se rule.[6] This court also believes that a per se rule in Chapter 11 cases is not called for. The court finds most persuasive the reasoning of the U.S. Court of Appeals for the Fifth Circuit in the case of *In re Elmwood Development Co.*, 964 F.2d 508 (5th Cir.1992). The court has also looked to the decision in the case of *In re Jartran, Inc.*, 886 F.2d 859 (7th Cir.1989).[7] A serial filing is not per se grounds for dismissal, but unless such a filing is for a legitimate purpose, it is made in bad faith and should be dismissed. Legitimate purposes for a second case include an orderly liquidation of a debtor which has failed to reorganize under its confirmed plan and is simply attempting to wind up its affairs in a manner most advantageous to its creditors. *Jartran*, 886 F.2d at 868–69. A second plan also may be legitimate if it results from events which were not anticipated, nor reasonably could have been anticipated at the time of the confirmation of the first plan. *Elmwood*, 964 F.2d at 511–12. "Where a debtor requests Chapter 11 relief for a second time, the good faith inquiry must focus on whether the second petition was filed to contradict the initial bankruptcy proceedings." *Id.* at 511. "[U]nanticipated changed circumstances may justify a valid successive

---

3. Movants' Exhibit No. 3, at pg. 18 (labeled June 12, 1997 deposition of Michael Rizzo of Pinnacle Management Company).

4. *See* Movants' Deposition Exhibit No. 11, part of Movants' Exhibit No. 7 (labeled June 12, 1997 deposition of Eric Hagen of ARC Water Treatment Company of Maryland, Inc.)

5. *See also In re Bono*, 70 B.R. 339, 341 n. 2 (Bankr.E.D.N.Y.1987); *In re Fountain*, 142 B.R. 135, 137 (Bankr.E.D.Va.1992); *In re Smith*, 85 B.R. 872, 874 (Bankr.W.D.Okla.1988); *In re Belmore*, 68 B.R. 889 (Bankr.M.D.Pa.1987).

6. *See In re Bullock*, 206 B.R. 389, 393 (Bankr. E.D.Va.1997); *In re Peia*, 204 B.R. 310, 313 (Bankr.D.Conn.1996).

7. *See also In re Jamesway Corp.*, 202 B.R. 697, 705–06 (Bankr.S.D.N.Y.1996); *In the Matter of Bouy, Hall & Howard Assoc.*, 208 B.R. 737, 743 (Bankr.S.D.Ga.1995).

request for Chapter 11 relief," because in such case the plan would be introduced to achieve new and distinct goals. *Id.*

■ Plan No. 2 is neither a liquidating plan nor results from events which were not anticipated by Plan No. 1. Indeed Plan No. 2 attempts to keep an impecunious single asset real estate project alive on an interest-only basis, in the hope that by the time year 2004 rolls around some economic salvation will have occurred which will allow a sale or refinancing of the property. In Plan No. 1, the debtor assumed the risk that it would be able to refinance or sell the property creating a fund to payoff the first trust loan by March of 1997. If not paid, foreclosure rights could be exercised by the first trust holder. This anticipated circumstance, while not what the debtor hoped for, has occurred and the debtor now wishes to change the plan in retrospect.

■ Plan No. 2 is an improper modification of Plan No. 1. Because substantial consummation of Plan No. 1 has occurred, that plan cannot be modified in Case No. 1. 11 U.S.C. § 1127(b).[8] 11 U.S.C. § 1101(2) defines substantial consummation as the occurrence of three events: "1) transfer of all or substantially all of the property proposed by the plan to be transferred; 2) assumption by the debtor ... of the business or of the management of all or substantially all of the property dealt with by the plan; and 3)commencement of distribution under the plan." All have occurred in the plan in Case No. 1. This court refuses to allow the debtor to elude the restrictions of § 1127(b) by a successive Chapter 11 filing under these circumstances. "[The] 'filing of a successive Chapter 11 ... after substantial consummation of a previously confirmed Chapter 11 case for the sole purpose of renegotiating previously agreed upon plan treatment is an impermissible motive for filing the successive case.'" *Elmwood,* 964 F.2d at 511 n. 9 (quoting *In re Miller,* 122 B.R. 360 (Bankr.N.D.Iowa 1990)).

The debtor argues that the only grounds for dismissal of a Chapter 11 for bad faith in

this circuit is under the reasoning and holding of *Carolin Corp. v. Miller,* 886 F.2d 693 (4th Cir.1989). In that decision the Fourth Circuit held that in order to dismiss a Chapter 11 on the basis of a bad faith filing, subjective bad faith and objective futility must be shown. The debtor argues that its second plan will succeed, is not objectively futile, and therefore, even if the court were to find subjective bad faith, it should not dismiss this case. The court is not convinced by the debtor's arguments. The facts of *Carolin* did not include a serial filing. It appears to this court that, for the reasons set forth in the *Elmwood* decision, the Fourth Circuit would agree that this court in the exercise of its equitable powers may dismiss a serial Chapter 11 case which was filed in bad faith.

■ Even if the debtor is correct, that the *Carolin Corp.* decision controls all Chapter 11 bad faith dismissals, this court finds both subjective bad faith and objective futility. The subjective bad faith is demonstrated by the impermissible serial filing, the duplicitous scheme to cloak a serial filing in an involuntary mantle, and the attempt to portray the filing as acts done by creditors independent of the debtor. As to objective futility, the court finds completely without credibility the naked projections made by the appraiser called to testify by the debtor. Mr. Donnelly was qualified to testify as to the value of the subject property. He was not qualified, nor did he testify to any credentials which gave weight to his projection that this property was and would continue to increase its revenues to the point that such projected profitability, which had not been achieved on any annual basis historically, would support values and cash flows that would make a sale or refinance possible within the extended period of the new plan. The debtor created the cash necessary to cure a tax default in 1996 by defaulting on the second trust payments. The debtor created the cash to pay a retainer to its counsel for this case by defaulting on payments to the first

---

8. 11 U.S.C. § 1127(b) states in part: "The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan *and before substantial consummation of such plan* .... " (emphasis added).

trust. These events clearly show the debtor's cash poor position.

In addition, in order to confirm Plan No. 2, the debtor would be required to demonstrate that it was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). For the reasons already enunciated, this court cannot find that Plan No. 2 was filed in good faith and must find it improperly modifies the Plan No. 1.

In looking at the facts and circumstances, this court has taken into consideration the legitimate interests of other creditors. Evidence concerning only the claims of those creditors discussed in this opinion was introduced. It has been shown that Beta and ARC have no real creditor interest to be protected in this case. The third petitioning creditor, the second trust holder, is subordinate to Movants. The fact that the second trust lien may be wiped out by a foreclosure of the first trust is a business risk assumed *ab initio* by the second trust holder. State law and rules provide a mechanism under which this second trust holder could protect itself. The second trust holder may attend the foreclosure sale and make a bid large enough to protect its interest. Of course, this means that the second trust holder must risk additional funds in the project. It may not be willing to risk its funds, as opposed to the first trust holders' funds upon the future promises of the debtor.

Accordingly, because this court finds that this is an improper serial filing of a Chapter 11 by this debtor and under the reasoning of the *Carolin Corp.* decision, this court shall enter an order dismissing this case.